

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SOARUS, L.L.C. | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 15 CV 10652 ) ) Hon. Charles R. Norgle |
| BOLSON MATERIALS INTERNATIONAL CORP. et al., | ) ) ) ) ) |
| Defendants. | ) |

**OPINION AND ORDER**

Plaintiff Soarus, L.L.C. ("Soarus") sues Defendants Bolson Materials International Corp. ("Bolson") and Timothy J. Heenan ("Heenan") (collectively, "Defendants") alleging trade secret misappropriation under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*; breach of contract; and unjust enrichment. Before the Court is Defendants' motion for summary judgment. For the following reasons, Defendants' motion is granted.

**I. BACKGROUND**

Bolson, owned and operated by Heenan, specializes in developing and selling products and processes for use in the 3D printing industry. Soarus specializes in marketing, sales, and research and development for specialty plastics. Nippon Synthetic Chemical Industry Co., Ltd ("Nippon") is a Japanese company that designs, manufactures, and sells various specialty products. Soarus is Nippon's exclusive distributor in parts of North and South America. Among the products developed by Nippon and sold by Soarus is a water soluble vinyl alcohol resin branded as Nichigo G-Polymer ("G-Polymer"). G-Polymer consists of a base resin which is combined with various additives to form different "grades" of the material.

1

On July 17, 2009, Heenan contacted Soarus expressing his interest in using G-Polymer for fuse deposition method 3D printing ("FDM"). FDM involves feeding a filament of material into a 3D printer, which is heated and extruded through a nozzle to form layers. The layers cool and harden, ultimately forming a 3D object per instructions programmed into the FDM 3D printer. Heenan was seeking to develop G-Polymer to make water soluble support structures in the FDM modeling process.

On July 17, 2009, Jim Swager ("Swager"), a commercial development manager at Soarus, responded via email to Heenan's initial communication expressing interest in G-Polymer. Swager informed Heenan that he would need to sign a non-disclosure agreement ("NDA") before Soarus would discuss technical details and samples relating to G-Polymer. On July 20, 2009, Swager sent Heenan a draft of Soarus's standard NDA titled "Secrecy Declaration."

Article six of the draft Secrecy Declaration provides that "[Bolson] shall not file any application for a patent or other intellectual property using any piece of the Confidential Information or the results of the Evaluation without prior written consent of [Nippon]." Defs' Mot. for Summ. J. ("Defs.' Mot."), Ex. 6. The draft Secrecy Declaration refers to Nippon and Soarus collectively as "Nippon." Id. The term "Confidential Information" refers to Soarus's "proprietary confidential information…relating to G-Polymer" and the term "Evaluation" refers to the "internal evaluation [of G-Polymer] for development or improvement of *Rapid Prototyping Materials* by [Bolson]." Id. (emphasis in original).

On July 22, 2009, Heenan emailed Swager and expressed his concern over Article six of the draft Secrecy Declaration. Specifically, Heenan stated that:

> As it is our intent to control the IP coming from development of the [G-Polymer] for our application, I just want to clarify that we will be able to do that. More

2

specifically, should the development be successful, we will only seek to protect our particular "application" of the material in our process. I'd hate to think that we will do the development work/testing and not end up with that protection. The NDA seems to leave that question out there as it seems we will have to seek the written consent of [Nippon]. Is it possible to obtain this permission in advance of the work?

Id., Ex. 8. Heenan sent a second email to Swager on July 22, 2009, further explaining his concern with Article Six:

> If we are unable to get an agreement on permission to protect our application, I think we would seek some kind of confidentiality coverage for the results of development work in our application and/or the info we pass to Nippon in the course of the project. We know a great deal about the rheology[1] and related requirements for materials to run successfully in these machines. I would not want to see Nippon use *our info* for any purpose other than developing a material application for Bolson.

Id., Ex. 9 (emphasis in original). On July 23, 2009, Swager responded to Heenan's July 22, 2009 emails, stating that:

> I [Swager] suggest we add an item# to NDA:
>
>> Bolson is free to patent and protect any new discoveries using [G-Polymer] in the specific area of Fuse Deposition Method Rapid Prototyping Equipment and Methods.
>
> I may still run into approval issues, but I believe above will be reasonable and acceptable on this end.

Id., Ex. 7. On July 23, Heenan responded to Swager's July 23, 2009 email, stating that:

> The phrasing you suggest works for me. It might even [be] more palatable to Nippon if we use the word "applications" instead of "discoveries" since [it's] more confining in scope and it is aligned with our intent to seek an "application patent" using a version of the g-polymer in FDM machines.

Id., Ex. 10.

---

[1] "Rheology" in this context refers to the plastic flow of solid materials in and out of a 3D printer's printing head.

On July 27, 2009, Swager sent an internal email to four other Soarus employees, including the president of Soarus, Mark Pucci ("Pucci"), seeking their review of the proposed amendment to the Secrecy Declaration. Id., Ex. 12. In this email, Swager stated that:

> Attached NDA is our standard 1-way with an added #10 that gives OK for very specific application area, Fuse Deposition Method Rapid Prototyping Equipment and Methods. This added paragraph was developed in discussions I had with Bolson. Bolson will not sample and test without this type of assurance... will [Nippon] approve this revised 1-way NDA for a very narrow and specific application?

Id. At some point on or after July 22, 2009,[2] but before the Secrecy Declaration was approved by Soarus, Swager forwarded Heenan's July 22, 2009 email, Defs.' Mot., Ex. 8, to Pucci and one other Soarus employee, stating that:

> I [Swager] have discussed the G-Polymer[] NDA with Tim Neenan [sic] of Bolson. Bolson would plan to patent/protect their process/material for a specific FDM (Fuse Deposition Method) machine for rapid prototyping (about 10,000 machines in the world). They object to the NDA and would like to add to the NDA that they are free to operate in the very narrow area defined.
>
> They will propose NDA wording. I believe this is OK since the area is very specific and narrow. There are only 2 suppliers today and the other supplier already has proprietary material technology, so Bolson is the right development partner.

Id., Ex. 15.

On August 20, 2009, Swager emailed Heenan informing him that "we have agreement on the [Secrecy Declaration]." Id., Ex. 16. The finalized Secrecy Declaration includes the same language as the draft Secrecy Declaration, with the addition of Article 10, which provides that: "Notwithstanding Article 6 hereof, Bolson is free to patent and protect any new applications using [G-Polymer] in the specific area of Fused Deposition Method Rapid Prototyping Equipment and Methods." Id., Ex. 17. Swager explained in his August 20, 2009 email that the

---

[2] The parties agree that the time stamp on the email marked as Defendants' Exhibit 15, which reads February, 2010, is incorrect. The parties further agree that the email was sent by Swager after July 22, 2009, but before the final draft of the Secrecy Declaration was approved by Soarus.

4

Secrecy Declaration "has all of the same wording [as previously negotiated] except in #10 has added 'Notwithstanding Article 6 hereof' to avoid a discrepancy of #6 and #10." Id., Ex. 16.

The Secrecy Declaration generally prohibits Defendants from disclosing Soarus's Confidential Information and the results of the Evaluation, but also contains some exceptions. For instance, Article Four permits the disclosure of Confidential Information that Bolson can demonstrate is in the public domain at the time of disclosure and Article Six prohibits disclosure of Confidential Information and the results of the Evaluation for the purpose of filing a patent application *unless* Nippon and Soarus provide written consent. Id. Whether Article Ten, as stated above, provides an additional exception is fiercely contested by the parties.

On August 21, 2009, Heenan signed and returned the Secrecy Declaration to Swager. Subsequent to the execution of the Secrecy Declaration, Defendants requested and received technical information and modified G-Polymer samples from Soarus. Various samples of G-Polymer were created in order to test and commercialize G-Polymer for use in the FDM process. Defendants tested the samples and provided feedback to Soarus, leading to the development of further samples.

On September 4, 2009, while working with Soarus to develop modified G-Polymer, Heenan filed a provisional patent application titled "Use and Provision of an Amorphous Vinyl Alcohol Polymer for Forming a Structure." Id., Ex. 18. Under the heading "Summary of Invention," Heenan's provisional patent application provided that "[i]n accordance with this invention a water-solutable [*sic*] amorphous vinyl alcohol polymer is used as an FDM support material. A preferred embodiment of the material is commercially available as Nichigo G-Polymer from Nippon Gohsei of Japan." Id. On September 4, 2010, Heenan filed a conventional patent application with the same title and nearly identical summary as his September 4, 2009

5

provisional patent application. On March 26, 2013, Heenan was issued U.S. Patent No. 8,404,171 (the "'171 Patent"). Heenan subsequently assigned the '171 Patent to Bolson. The abstract of the '171 Patent describes the protected invention as follows:

> A process for three-dimensional modeling in which water soluble thermoplastic material is used in an additive deposition process to form a soluble support structure for a three-dimensional model formed via layer-by-layer deposition of the model's geometry. The water-soluble thermoplastic material includes a base of vinyl alcohol. Following the completion of the model, the model is placed in a cold water bath to dissolve the support structure. The water-soluble material can also be used to form [a] soluble model directly.

Defs.' Mot., Ex. 27.

Soarus asserts that the '171 Patent contains numerous unauthorized disclosures of Confidential Information relating to G-Polymer. Soarus further asserts that Defendants acquired and used Soarus's Confidential Information without authorization when applying for and obtaining the '171 Patent. Soarus points to numerous sections of the '171 Patent which describe certain G-Polymer additives and other technical details relating to the modification of G-Polymer for use in the FDM process. Defendants refute any "unauthorized" acquisition, disclosure, or use of Soarus's Confidential Information. Rather, Defendants claim that while the '171 Patent contains information which Soarus considers Confidential Information, their acquisition, disclosure, and use of this information was expressly authorized by Soarus under the Secrecy Declaration.

## II. DISCUSSION

### A. Standard of Review

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists

and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.").

The parties do not dispute that Illinois law governs the Secrecy Declaration. Nor do they dispute that the Secrecy Declaration represents the final form of the agreement executed by the parties. Accordingly, the Court will interpret the Secrecy Declaration under Illinois law. See Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E.2d 801, 821 (2005) ("As a general rule, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law.").

"The starting point of any contract analysis is the language of the contract itself." Id. A court's objective when construing the language of a contract is to give effect to the parties' intent. Thompson v. Gordon, 948 N.E.2d 39, 47 (2011). "A court will first look to the language of the contract itself to determine the parties' intent." Id. "If the words used in the [contract] are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." C. Illinois Light Co. v. Home Ins. Co., 821 N.E.2d 206, 213 (2004). However, if the language of a contract is ambiguous, "a court can consider extrinsic evidence to determine the parties' intent." Thompson, 948 N.E.2d at 47. The language of a contract is ambiguous when "the words used in the [contract] are reasonably susceptible to more than one meaning." C. Illinois Light Co., 821 N.E.2d at 213. Further, "an ambiguity will be found if the language of the contract is 'obscure in meaning through indefiniteness of expression.'" Id. (quoting Platt v. Gateway International Motorsports Corp., 351 Ill.App.3d 326, 330 (2004)). Such ambiguity "will be strictly construed against the drafter." Id. "A contract is not rendered ambiguous merely because the parties disagree on its meaning." Id.

when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The Court must view "the record in the light most favorable to the nonmovant and [avoid] the temptation to decide which party's version of the facts is more likely true." Id.

**B. The Secrecy Declaration Authorized Defendants to Acquire, Disclose, and Use Soarus's Confidential Information Relating to G-Polymer in Obtaining the '171 Patent**

The central issue in this case is one of contract interpretation: whether the Secrecy Declaration authorized Defendants to acquire, disclose, and use Soarus's Confidential Information relating to G-Polymer in applying for and obtaining the '171 Patent. This issue is dispositive because Soarus must show that Defendant's acquisition, disclosure, or use of the Confidential Information was *improper or unauthorized* in order to prove its claims of trade secret misappropriation, breach of contract, and unjust enrichment. See Liebert Corp. v. Mazur, 827 N.E.2d 909, 925 (Ill. App. 1st Dist. 2005) (Trade secret misappropriation "can be shown one of three ways—by improper acquisition, unauthorized disclosure, *or* unauthorized use.") (emphasis in original); see also Timan v. Ourada, 972 N.E.2d 744, 751 (Ill. App. 2d Dist. 2012) ("The elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) *breach of contract* by the defendant; and (4) resultant injury to the plaintiff.") (emphasis added); see also HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 679 (Ill. 1989) (A claim of unjust enrichment requires a plaintiff to show that the "defendant has unjustly retained a benefit to the plaintiff's detriment,

7

Here, the parties disagree on the meaning of Article Ten of the Secrecy Declaration. Defendants assert that Article Ten expressly authorizes their acquisition, disclosure, and use of Soarus's Confidential Information for the purpose of obtaining the '171 Patent. Soarus, on the other hand, argues that Article Ten states only that Defendants can patent and protect new applications using G-Polymer in the area of FDM, but does not permit Defendants to use Soarus's Confidential Information for this purpose. In other words, Soarus asserts that Article Ten does not provide an exception to the Secrecy Declaration's general prohibition on Defendants' use of Soarus's Confidential Information. Accordingly, the Court turns to construing the language of Article Ten.

Article Ten begins with the words "[n]otwithstanding Article 6 hereof." The plain and ordinary meaning of "notwithstanding" is "despite" or "in spite of." *Notwithstanding*, BLACK'S LAW DICTIONARY (10th ed. 2014). The remainder of Article Ten states that "Bolson is free to patent and protect any new applications using [G-Polymer] in the specific area of Fused Deposition Method Rapid Prototyping Equipment and Methods." Giving the words their plain, ordinary, and popular meaning, the Court interprets Article Ten as meaning: "In spite of the requirement that Defendants shall not file any application for a patent or other intellectual property using any piece of the Confidential Information or the results of the Evaluation without prior written consent of Nippon and Soarus, Bolson is free to patent and protect any new applications using G-Polymer in the specific area of Fused Deposition Method Rapid Prototyping Equipment and Methods." Therefore, contrary to Soarus's proposed interpretation, Article Ten unambiguously authorizes Defendants to use Soarus's Confidential Information in applying for a patent to protect "any new applications using G-Polymer in the specific area of Fused Deposition Method Rapid Prototyping Equipment and Methods," without first obtaining

9

written consent from Nippon and Soarus. This is the only reasonable interpretation of Article Ten because the term "notwithstanding" works to set aside Article Six in its entirety, which does not just prohibit Defendants from filing a patent relating to G-Polymer, but specifically prohibits filing a patent *using Soarus's Confidential Information* or the results of the Evaluation.

Soarus contends that the Court's interpretation above contradicts the intent of the Secrecy Declaration as a whole. Soarus refers to other articles of the Secrecy Declaration, such as Articles One and Two, which state respectively that that Bolson "shall not use the Samples and/or Confidential Information for any purpose other than the Evaluation" and Bolson "shall hold in the strictest confidence the Samples, Confidential Information and the results of the Evaluation, taking all reasonable measures to ensure the confidentiality and limitations on use." However, Soarus's argument fails to recognize that the Secrecy Declaration as a whole does not impose an absolute prohibition Defendants' disclosure or use of its Confidential Information. For instance, Article Four sets forth the exception for disclosure of Confidential Information that Bolson can demonstrate is in the public domain at the time of disclosure. Further, Article Six provides that Bolson is prohibits disclosure for the purpose of filing a patent application *unless* Nippon and Soarus provide written consent. Thus, the Court's interpretation of Article Ten as an exception to the general prohibition of Defendant's disclosure or use of Soarus's Confidential Information is consistent with the Secrecy Declaration as a whole. Additionally, to the extent that Soarus claims that Article Ten is inconsistent or conflicts with other terms of the Secrecy Declaration, any such inconsistency is strictly construed against Soarus as the drafter of the Secrecy Declaration. See Lippo v. Mobil Oil Corp., 776 F.2d 706, 714 (7th Cir. 1985) (applying Illinois law, holding that "a contract containing inconsistencies or conflicting terms is to be construed against the drafter").

Moreover, in light of the Secrecy Declaration's broad definitions of "Confidential Information," accepting Soarus's interpretation of Article ten would render the provision meaningless. The Secrecy Declaration defines "Confidential Information" as "proprietary confidential information…relating to G-Polymer." Pucci testified as Soarus's Rule 30(b)(6) witness that in 2009, at the time that the parties executed the Secrecy Declaration, Soarus "considered anything about G-polymer to be highly confidential." Pl.'s Mem. in Opp., Ex. 14 at 274:17-18. Given these broad definitions and the detailed information required to apply for and obtain a patent, Defendants could not patent "any new applications using G-Polymer in the specific area of Fused Deposition Method Rapid Prototyping Equipment and Methods" without including at least some Confidential Information or the results of the Evaluation. See 35 U.S.C. § 112 (providing that a patent application "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention."). Accordingly, the Court rejects Soarus's proposed interpretation of Article 10 because it is unreasonable and renders Article 10 meaningless. See Thompson, 948 N.E.2d at 47 ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used.").

Given the Court's holding above, there is no need to examine extrinsic evidence to determine the parties' intent with respect to the meaning of Article Ten and the Secrecy Declaration in general. However, even if the Court were to consider extrinsic evidence, the result would be the same. The numerous emails between Heenan and Swager prior to the execution of

11

the Secrecy Declaration provide a detailed account of the parties' intent. Heenan clearly expressed that he wanted the Secrecy Declaration to reflect that Defendants would not need written consent from Nippon and Soarus to patent "the [intellectual property] coming from the development of… [G-Polymer] for Defendant's application" and that Defendants were seeking to obtain an "'application patent' using a version of [G-Polymer] in FDM machines." Defs.' Mot., Ex. 8. In response, Swager proposed the addition of Article Ten to the Secrecy Declaration. Id., Ex. 7. Swager also communicated to Pucci and other Soarus employees that Defendants "would like to add to the [Secrecy Declaration] that they are free to operate in the very narrow area [of FDM]" and that Article Ten "gives [the] OK for very specific application area, [FDM] Prototyping Equipment and Methods." Id., Exs. 12, 15. Therefore, even if the Court were to conclude that the meaning of Article Ten is ambiguous, the undisputed extrinsic evidence shows that the Secrecy Declaration authorizes Defendants to patent or protect "any new applications using G-Polymer in the specific area of Fused Deposition Method Rapid Prototyping Equipment and Methods," without first obtaining written consent from Nippon and Soarus.

Finally, the Court must consider whether Defendants acquisition, disclosure, and use of Soarus's Confidential Information for the purpose of obtaining the '171 Patent violated the unambiguous terms of the Secrecy Declaration. As noted above, the summary of the '171 Patent states that it protects a process in which "a water-soluble amorphous vinyl alcohol polymer is used as a [FDM] support material." The parties do not dispute that G-Polymer is a water soluble vinyl alcohol resin. The '171 Patent also provides that "[a] preferred embodiment of the [water-soluble amorphous vinyl alcohol polymer] is commercially available as Nichigo G-Polymer from Nippon Gohsei of Japan." The remainder of the '171 Patent is consistent with the summary, describing a process in which a water soluble vinyl alcohol polymer—a modified version of G-

12

Polymer—is applied to make support structures in FDM 3D printing. Therefore, the '171 Patent protects exactly what is permitted by Article Ten of the Secrecy Declaration—a "new application[] using [G-Polymer] in the specific area of Fused Deposition Method Rapid Prototyping Equipment and Methods." Accordingly, given the unambiguous meaning of Article Ten of the Secrecy Declaration and the contents of the '171 Patent, Defendants acquisition, disclosure, and use of Soarus's Confidential Information were not improper or unauthorized.

Defendants set forth numerous alternative arguments in support of their motion. However, in light of the Court's holding above, there is no need to consider Defendants' alternative arguments.

### III. CONCLUSION

The Secrecy Declaration unambiguously authorizes Defendants to use Soarus's Confidential Information in obtaining a patent for "any new applications using G-Polymer in the specific area of Fused Deposition Method Rapid Prototyping Equipment and Methods," without first obtaining written consent from Soarus. Therefore, given the contents of the '171 Patent, Defendants' acquisition, disclosure, and use of Soarus's Confidential Information were not improper or unauthorized. Accordingly, Defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 27, 2017